**IN THE UNITED STATE DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
DEC 2 2020
LONG ISLAND OFFICE

SCANNED

| | |
|---|---|
| Salman Khan, an Individual | ) Case No.: |
| | ) |
| Plaintiff(s) | ) **COMPLAINT FOR:** |
| | ) |
| -v- | ) **(1) DECLARATORY** |
| | ) **RELIEF/INJUNCTIVE** |
| National Geographic Partners, LLC, | ) **RELIEFT/JUDGEMENT; AND** |
| The Walt Disney Company, | ) **(2) DEFAMATION** |
| Hulu, LLC, YOUTUBE Entertainment | ) |
| Studios, Inc., | ) |
| Netflix, Inc. Comcast Capital Corporation, | ) |
| NBCUniversal Media, LLC, and | ) **DEMAND FOR JURY TRIAL** |
| DOES 1-100. | ) |
| | ) |
| Defendant(s) | ) |
| | ) |

**CV 20 6301**

**MATSUMOTO, J.**

**KUO, M.J.**

## COMPLAINT AND JURY DEMAND

Now comes PLAINTIFF, SALMAN KHAN, an Individual, in Pro Se, and as for his

Complaint against DEFENDANTS, herewith avers and states as follows:

### THE PARTIES

1. Plaintiff Mr. Salman Khan ("Mr. Khan"), an individual, is a resident of the State of New

York.

2. Defendant National Geographic Partners, LLC, ("NatGeo") is a Delaware limited liability

company formed on August 27, 2015.

3. Defendant The Walt Disney Company ("Disney") is a Delaware corporation formed on June

14, 2018.

4. Defendant Hulu, LLC ("Hulu") is a Delaware limited liability company formed on June 11,

2007.

5. Defendant YOUTUBE Entertainment Studios, Inc. ("YOUTUBE") is a Delaware corporation formed on December 19, 2017.

6. Defendant Netflix, Inc. ("Netflix") is a Delaware corporation formed on August 29, 1997.

7. Defendant Comcast Capital Corporation ("Comcast") is a Delaware Corporation formed on January 28, 1993.

8. Defendant NBCUniversal Media, LLC, is a Delaware limited liability company formed on May 6, 1986.

9. The true names and capacities of the defendants DOES 1 through 100, inclusive, whether individual, plural, corporate, partnership, associate or otherwise, are not known to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff will seek leave of this Honorable Court to amend this Complaint to show the true names and capacities of defendants DOES 1 through 100, inclusive, when the same have been ascertained.

10. Plaintiff is also informed and believe and thereon alleges that DOES 1 through 100 were the agents, principals, and/or alter egos of Defendants, at all times herein relevant, and that they are therefor liable for the acts and omissions of Defendants.

## JURISDICTION AND VENUE

11. Pursuant to 28 U.S.C. § 1332, this Honorable Court has original jurisdiction over Plaintiff's claims based on the Parties' diversity of citizenship.

12. This Court has subject matter jurisdiction because the amount in controversy exceeds $75.000.00, exclusive of interest and costs, and is between citizens of different states, pursuant to 28 U.S.C. §1332(a).

13. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391, and this Honorable Court has personal jurisdiction over the Defendants' and each of them , by reason of the fact, that

among other things (a) they are headquartered in New York; (b) and may of the events giving rise to this action arose in New York, including within the County of Nassau, where Plaintiff lives.

## CHOICE OF LAW

14.     This Complaint alleges violations of the torts of defamation and false light pursuant to 28 U.S.C. § 4101. Defamation and false light are well established in New York common law, as well as common law in every state across the country. For the torts of defamation and false light, it is the state in which the defamed plaintiff was domiciled at the time the tortious comments (broadcasts) were made as plaintiff's state of residence is "the place of greatest potential injury to the reputation of Plaintiff." Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496-97, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941); Mattox v. News Syndicate Co., 176 F.2d 897, 900 (2d Cir.), cert. denied, 338 U.S. 858, 70 S. Ct. 100, 94 L. Ed. 525 (1949). Under New York law a court must apply the substantive tort law of the state that has the most significant relationship with the occurrence and with the parties. Babcock v. Jackson, 12 N.Y.2d 473, 482, 240 N.Y.S.2d 743, 752, 191 N.E.2d 279 (1963). In Plaintiff's case, his employment, which he enjoyed not just across the United States, but across the world was irreparably damaged, and the Defendant's violated his civil rights (28 U.S.C. § 1983) by their tortious defamation and false light actions.

## FACTUAL BACKGROUND

15.     PLAINTIFF believes, and on such information and belief, alleges, that each of the aforementioned DEFENDANTS published, broadcast, rebroadcast, streamed, and/or restreamed defamatory content concerning PLAINTIFF via the National Geographic original program "To Catch A Smuggler" without his consent and/or signed released. PLAINTIFF will seek leave of

this Honorable Court to amend this Complaint and insert the true names of DEFENDANTS in place of their fictitious names when the same have become known to PLAINTIFF.

16.     On or about December 2011, Plaintiff went on an overseas trip to Bangladesh for a family wedding. During the trip Plaintiff's wife forced him to make a false statement to the U.S. Embassy about his parents being kidnapped. Plaintiff later reported to the U.S. Embassy that the statement was false, and he was forced to make the report by his now ex-wife.

17.     On or January 2012, when returning from the trip to Bangladesh at John F. Kennedy Airport ("JFK") in New York, U.S. Customs and Border Patrol (CBP) officers stopped Plaintiff in JFK and detained him for further questioning about the report he had made to the U.S. Embassy.

18.     Before questioning Plaintiff, CBP officers detained Plaintiff for more than five (5) hours awaiting the arrival of a National Geographic ("NatGeo") film crew to arrive at the airport. The NatGeo film crew was in New York City filming footage and scenes for its upcoming original series "To Catch A Smuggler" ("Series").

19.     After the arrival of the NatGeo film crew, two CBP officers started to question Plaintiff about his trip to Bangladesh, and the report he made to the U.S. Embassy while in Bangladesh while the film crew taped and recorded the interview.

20.     Plaintiff was detained and questioned for 30 minutes and was told that he was required to answer all CBP questions on camera without an attorney or he would go to jail.

21.     Plaintiff informed the NatGeo film crew that he adamantly did not want his face to appear in the series and he was not authorizing them to use his face, image, or likeness in any form.

22.     Plaintiff never signed any kind of authorization or release with NatGeo allowing them to use is interview, face, or likeness of any kind on the program.

23.     After being held and interviewed by CBP for five (5) hours and being filmed by NatGeo's film crew, Plaintiff was released without any charges being filed against him.

24.     On or about mid- to late-January 2012, the FBI contacted Plaintiff again requiring him to do a second interview with the FBI regarding the report he had made to the U.S. Embassy. Plaintiff was interviewed by two FBI agents, who determined that he had done nothing wrong.

25.     On or about August 8, 2012, Plaintiff received more than 100 telephone calls and text messages from family members and friends who reported seeing Plaintiff on the first episode of NatGeo's series "To Catch a Smuggler: Courier to Kingpin" ("Episode"). Family and friends reported seeing the program on Netflix, Hulu, YouTube, and other streaming channels and services.

26.     Family and friends began berating Plaintiff, saying evil and ugly things about him to the point that Plaintiff became suicidal because the airing of the Episode has made Plaintiff an embarrassment to his family.

27.     As a direct and proximate result of the airing of the Episode with Plaintiff's face, he has been ostracized and disowned by family causing him great harm and distress. Plaintiff's son, who is a U.S. Marine, ceased all contact with his father after seeing the program in 2016. Plaintiff has had no contact with his son since.

28.     Prior to the filming and airing of the Episode, Plaintiff was a limousine driver for several executive limousine services for highly confidential clients, including foreign governments, government agencies, dignitaries and celebrities from around the world.

29.     As a direct and proximate result of the airing and re-airing of the Episode, Plaintiff lost two of his major executive limousine accounts after the business viewed Plaintiff on the series Episode in 2012, 2013, and 2015 on various streaming channels including National Geographic Channel, Netflix, Hulu, YouTube, and other streaming channels and services.

30.     Over the years, Plaintiff has been in touch with NatGeo attorneys who have successfully removed the airing of the program on YouTube and who have stated that the program would be altered to blur out his face. While from time to time the YouTube programs have been removed, the Episode with featuring Plaintiff's unfettered face continues to air around the world on various streaming channels and services, continuing the irreparable harm to his name, face, reputation, business, and family.

31.     As recently as mid-2020, the NatGeo series with Plaintiff in it has appeared on Hulu live television and viewed by more of Plaintiff's friends and his fiancé.

32.     On or about July 8, 2020, Plaintiff drove from Baldwin, New York to Addison, Illinois for his nephew's wedding—a small religious ceremony—on July 10, 2020. On or about July 9, 2020, after Plaintiff had driven across country, his brother called him and told him that his older sister did not want him at the ceremony because she feared someone would recognize him from the Series and ruin the wedding. Plaintiff drove home, crying, again being alienated from his family for the airing of the Episode.

33.     Plaintiff and his fiancé had a baby boy on June 17, 2020, and after learning that Plaintiff had been featured in the Episode his fiancé left him with his son, irreparable damaging his relationship with his fiancé and alienating him his new-born son.

34.     In late July 2020, Plaintiff was contacted by another friend who viewed the Episode on Hulu live.

35.     Plaintiff, who once worked as respected and confidential limousine driver with a high

security clearance for foreign governments, government agencies, dignitaries and celebrities

from around the world now is reduced to worker as an UBER driver and has suffered a

catastrophic loss to income was well as the irreparable harm to family relationships, friendships,

and to his relationship with his fiancé and the alienation from his new born son.

36.     Plaintiff has suffered irreparable harm to his mental health and well-being, his financial

well-being and as to his personal relationships which appears cannot be repaired due to the airing

of the episode by NatGeo.

37.     As a direct and proximate result of DEFENDANTS', and all of them, negligent actions,

Plaintiff has been harmed.

38.     As a direct and proximate result of DEFENDANTS', and all of them, facts and

circumstances known to viewers due to the nature of the Series and/or Episode, Plaintiff has been

insured in his personal life and occupation which has exposed him to hatred, contempt, ridicule

and shame, and has discourage others from associating or dealing with him.

39.     As a direct and proximate result of DEFENDANTS, and all of them, have failed to use

reasonable care to broadcast the said Episode to prevent harm to Plaintiff.

40.     Plaintiff has suffered harmed to his business, profession and occupation.

41.     DEFENDANTS', and all of them, actions in broadcasting, re-broadcasting, airing, re-

airing, streaming, and re-streaming of the Episode with Plaintiff's face is the substantial factor in

causing Plaintiff's harm.

### COUNT 1
### COMMON LAW DEFAMATION PER SE
#### (As to ALL Defendants)

42.   Plaintiff hereby re-alleges and incorporates allegations of Paragraphs 1-41 as though fully

set forth herein.

43.     PLAINTIFF believes, and on such information and belief, alleges, that each of the aforementioned DEFENDANTS published, broadcast, rebroadcast, streamed, and/or restreamed defamatory content concerning PLAINTIFF via the National Geographic original program "To Catch A Smuggler" without his consent and/or signed released. PLAINTIFF will seek leave of this Honorable Court to amend this Complaint and insert the true names of DEFENDANTS in place of their fictitious names when the same have become known to PLAINTIFF.

44.     On or about December 2011, Plaintiff went on an overseas trip to Bangladesh for a family wedding. During the trip Plaintiff's wife forced him to make a false statement to the U.S. Embassy about his parents being kidnapped. Plaintiff later reported to the U.S. Embassy that the statement was false, and he was forced to make the report by his now ex-wife.

45.     On or January 2012, when returning from the trip to Bangladesh at John F. Kennedy Airport ("JFK") in New York, U.S. Customs and Border Patrol (CBP) officers stopped Plaintiff in JFK and detained him for further questioning about the report he had made to the U.S. Embassy.

46.     Before questioning Plaintiff, CBP officers detained Plaintiff for more than five (5) hours awaiting the arrival of a National Geographic ("NatGeo") film crew to arrive at the airport. The NatGeo film crew was in New York City filming footage and scenes for its upcoming original series "To Catch A Smuggler" ("Series").

47.     After the arrival of the NatGeo film crew, two CBP officers started to question Plaintiff about his trip to Bangladesh, and the report he made to the U.S. Embassy while in Bangladesh while the film crew taped and recorded the interview.

48.     Plaintiff was detained and questioned for 30 minutes and was told that he was required to answer all CBP questions on camera without an attorney or he would go to jail.

49.    Plaintiff informed the NatGeo film crew that he adamantly did not want his face to appear in the series and he was not authorizing them to use his face, image, or likeness in any form.

50.    Plaintiff never signed any kind of authorization or release with NatGeo allowing them to use is interview, face, or likeness of any kind on the program.

51.    After being held and interviewed by CBP for five (5) hours and being filmed by NatGeo's film crew, Plaintiff was released without any charges being filed against him.

52.    On or about mid- to late-January 2012, the FBI contacted Plaintiff again requiring him to do a second interview with the FBI regarding the report he had made to the U.S. Embassy. Plaintiff was interviewed by two FBI agents, who determined that he had done nothing wrong.

53.    On or about August 8, 2012, Plaintiff received more than 100 telephone calls and text messages from family members and friends who reported seeing Plaintiff on the first episode of NatGeo's series "To Catch a Smuggler: Courier to Kingpin" ("Episode"). Family and friends reported seeing the program on Netflix, Hulu, YouTube, and other streaming channels and services.

54.    Family and friends began berating Plaintiff, saying evil and ugly things about him to the point that Plaintiff became suicidal because the airing of the Episode has made Plaintiff an embarrassment to his family.

55.    As a direct and proximate result of the airing of the Episode with Plaintiff's face, he has been ostracized and disowned by family causing him great harm and distress. Plaintiff's son, who is a U.S. Marine, ceased all contact with his father after seeing the program in 2016. Plaintiff has had no contact with his son since.

56.     Prior to the filming and airing of the Episode, Plaintiff was a limousine driver for several executive limousine services for highly confidential clients, including foreign governments, government agencies, dignitaries and celebrities from around the world.

57.     As a direct and proximate result of the airing and re-airing of the Episode, Plaintiff lost two of his major executive limousine accounts after the business viewed Plaintiff on the series Episode in 2012, 2013, and 2015 on various streaming channels including National Geographic Channel, Netflix, Hulu, YouTube, and other streaming channels and services.

58.     Over the years, Plaintiff has been in touch with NatGeo attorneys who have successfully removed the airing of the program on YouTube and who have stated that the program would be altered to blur out his face. While from time to time the YouTube programs have been removed, the Episode with featuring Plaintiff's unfettered face continues to air around the world on various streaming channels and services, continuing the irreparable harm to his name, face, reputation, business, and family.

59.     As recently as mid-2020, the NatGeo series with Plaintiff in it has appeared on Hulu live television and viewed by more of Plaintiff's friends and his fiancé.

60.     On or about July 8, 2020, Plaintiff drove from Baldwin, New York to Addison, Illinois for his nephew's wedding—a small religious ceremony—on July 10, 2020. On or about July 9, 2020, after Plaintiff had driven across country, his brother called him and told him that his older sister did not want him at the ceremony because she feared someone would recognize him from the Series and ruin the wedding. Plaintiff drove home, crying, again being alienated from his family for the airing of the Episode.

61.     Plaintiff and his fiancé had a baby boy on June 17, 2020, and after learning that Plaintiff had been featured in the Episode his fiancé left him with his son, irreparable damaging his relationship with his fiancé and alienating him his new-born son.

62.     In late July 2020, Plaintiff was contacted by another friend who viewed the Episode on Hulu live.

63.     Plaintiff, who once worked as respected and confidential limousine driver with a high security clearance for foreign governments, government agencies, dignitaries and celebrities from around the world now is reduced to worker as an UBER driver and has suffered a catastrophic loss to income was well as the irreparable harm to family relationships, friendships, and to his relationship with his fiancé and the alienation from his new born son.

64.     Plaintiff has suffered irreparable harm to his mental health and well-being, his financial well-being and as to his personal relationships which appears cannot be repaired due to the airing of the episode by NatGeo.

65.     As a direct and proximate result of DEFENDANTS', and all of them, negligent actions, Plaintiff has been harmed.

66.     As a direct and proximate result of DEFENDANTS', and all of them, facts and circumstances known to viewers due to the nature of the Series and/or Episode, Plaintiff has been insured in his personal life and occupation which has exposed him to hatred, contempt, ridicule and shame, and has discourage others from associating or dealing with him.

67.     As a direct and proximate result of DEFENDANTS, and all of them, have failed to use reasonable care to broadcast the said Episode to prevent harm to Plaintiff.

68.     Plaintiff has suffered harmed to his business, profession and occupation.

69.     DEFENDANTS', and all of them, actions in broadcasting, re-broadcasting, airing, re-airing, streaming, and re-streaming of the Episode with Plaintiff's face is the substantial factor in causing Plaintiff's harm.


WHEREFORE, Plaintiff prays for judgment against Defendants, and all of them, for the appropriate compensatory damages, punitive damages, and costs.

## COUNT 2
## COMMON LAW FALSE LIGHT
### (As to ALL Defendants)

70.  Plaintiff hereby re-alleges and incorporates allegations of Paragraphs 1-70 as though fully set forth herein.

71.     PLAINTIFF believes, and on such information and belief, alleges, that each of the aforementioned DEFENDANTS published, broadcast, rebroadcast, streamed, and/or restreamed defamatory content concerning PLAINTIFF via the National Geographic original program "To Catch A Smuggler" without his consent and/or signed released. PLAINTIFF will seek leave of this Honorable Court to amend this Complaint and insert the true names of DEFENDANTS in place of their fictitious names when the same have become known to PLAINTIFF.

72.     On or about December 2011, Plaintiff went on an overseas trip to Bangladesh for a family wedding. During the trip Plaintiff's wife forced him to make a false statement to the U.S. Embassy about his parents being kidnapped. Plaintiff later reported to the U.S. Embassy that the statement was false, and he was forced to make the report by his now ex-wife.

73.     On or January 2012, when returning from the trip to Bangladesh at John F. Kennedy Airport ("JFK") in New York, U.S. Customs and Border Patrol (CBP) officers stopped Plaintiff

in JFK and detained him for further questioning about the report he had made to the U.S. Embassy.

74.     Before questioning Plaintiff, CBP officers detained Plaintiff for more than five (5) hours awaiting the arrival of a National Geographic ("NatGeo") film crew to arrive at the airport. The NatGeo film crew was in New York City filming footage and scenes for its upcoming original series "To Catch A Smuggler" ("Series").

75.     After the arrival of the NatGeo film crew, two CBP officers started to question Plaintiff about his trip to Bangladesh, and the report he made to the U.S. Embassy while in Bangladesh while the film crew taped and recorded the interview.

76.     Plaintiff was detained and questioned for 30 minutes and was told that he was required to answer all CBP questions on camera without an attorney or he would go to jail.

77.     Plaintiff informed the NatGeo film crew that he adamantly did not want his face to appear in the series and he was not authorizing them to use his face, image, or likeness in any form.

78.     Plaintiff never signed any kind of authorization or release with NatGeo allowing them to use is interview, face, or likeness of any kind on the program.

79.     After being held and interviewed by CBP for five (5) hours and being filmed by NatGeo's film crew, Plaintiff was released without any charges being filed against him.

80.     On or about mid- to late-January 2012, the FBI contacted Plaintiff again requiring him to do a second interview with the FBI regarding the report he had made to the U.S. Embassy. Plaintiff was interviewed by two FBI agents, who determined that he had done nothing wrong.

81.     On or about August 8, 2012, Plaintiff received more than 100 telephone calls and text messages from family members and friends who reported seeing Plaintiff on the first episode of

NatGeo's series "To Catch a Smuggler: Courier to Kingpin" ("Episode"). Family and friends reported seeing the program on Netflix, Hulu, YouTube, and other streaming channels and services.

82.    Family and friends began berating Plaintiff, saying evil and ugly things about him to the point that Plaintiff became suicidal because the airing of the Episode has made Plaintiff an embarrassment to his family.

83.    As a direct and proximate result of the airing of the Episode with Plaintiff's face, he has been ostracized and disowned by family causing him great harm and distress. Plaintiff's son, who is a U.S. Marine, ceased all contact with his father after seeing the program in 2016. Plaintiff has had no contact with his son since.

84.    Prior to the filming and airing of the Episode, Plaintiff was a limousine driver for several executive limousine services for highly confidential clients, including foreign governments, government agencies, dignitaries and celebrities from around the world.

85.    As a direct and proximate result of the airing and re-airing of the Episode, Plaintiff lost two of his major executive limousine accounts after the business viewed Plaintiff on the series Episode in 2012, 2013, and 2015 on various streaming channels including National Geographic Channel, Netflix, Hulu, YouTube, and other streaming channels and services.

86.    Over the years, Plaintiff has been in touch with NatGeo attorneys who have successfully removed the airing of the program on YouTube and who have stated that the program would be altered to blur out his face. While from time to time the YouTube programs have been removed, the Episode with featuring Plaintiff's unfettered face continues to air around the world on various streaming channels and services, continuing the irreparable harm to his name, face, reputation, business, and family.

87.     As recently as mid-2020, the NatGeo series with Plaintiff in it has appeared on Hulu live television and viewed by more of Plaintiff's friends and his fiancé.

88.     On or about July 8, 2020, Plaintiff drove from Baldwin, New York to Addison, Illinois for his nephew's wedding—a small religious ceremony—on July 10, 2020. On or about July 9, 2020, after Plaintiff had driven across country, his brother called him and told him that his older sister did not want him at the ceremony because she feared someone would recognize him from the Series and ruin the wedding. Plaintiff drove home, crying, again being alienated from his family for the airing of the Episode.

89.     Plaintiff and his fiancé had a baby boy on June 17, 2020, and after learning that Plaintiff had been featured in the Episode his fiancé left him with his son, irreparable damaging his relationship with his fiancé and alienating him his new-born son.

90.     In late July 2020, Plaintiff was contacted by another friend who viewed the Episode on Hulu live.

91.     Plaintiff, who once worked as respected and confidential limousine driver with a high security clearance for foreign governments, government agencies, dignitaries and celebrities from around the world now is reduced to worker as an UBER driver and has suffered a catastrophic loss to income was well as the irreparable harm to family relationships, friendships, and to his relationship with his fiancé and the alienation from his new born son.

92.     Plaintiff has suffered irreparable harm to his mental health and well-being, his financial well-being and as to his personal relationships which appears cannot be repaired due to the airing of the episode by NatGeo.

93.     As a direct and proximate result of DEFENDANTS', and all of them, negligent actions, Plaintiff has been harmed.

94.    As a direct and proximate result of DEFENDANTS', and all of them, facts and circumstances known to viewers due to the nature of the Series and/or Episode, Plaintiff has been insured in his personal life and occupation which has exposed him to hatred, contempt, ridicule and shame, and has discourage others from associating or dealing with him.

95.    As a direct and proximate result of DEFENDANTS, and all of them, have failed to use reasonable care to broadcast the said Episode to prevent harm to Plaintiff.

96.    Plaintiff has suffered harmed to his business, profession and occupation.

97.    DEFENDANTS', and all of them, actions in broadcasting, re-broadcasting, airing, re-airing, streaming, and re-streaming of the Episode with Plaintiff's face is the substantial factor in causing Plaintiff's harm.

WHEREFORE, Plaintiff prays for judgment against Defendants, and all of them, for the appropriate compensatory damages, punitive damages, and costs.

WHEREFORE, Plaintiff prays for judgment against Defendants, and all of them, for the appropriate compensatory damages, punitive damages, and costs.

## RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

1.    Issue an injunction against Defendants, and all of them, to cease and desist, all broadcasting, rebroadcasting, airing, re-airing, distribution streaming and/or restreaming of Season 1, Episode 1 "To Catch A Smuggler" without permanently blurring out Plaintiff's face, and/or removing the portions of the program in which Plaintiff appears;

2.    Or DEFENDANTS, and all of them, to recover all distributed copies of Season 1, Episode 1, "To Catch A Smuggler" showing Plaintiff's face;

3.

4.     Order DEFENDANTS, and all of them, to pay compensatory damages for irreparable

damages caused to Plaintiff's career and reputation;

5.     Order DEFENDANTS, and all of them, to pay punitive damages for pain and suffering

due to the damage to his career and reputation, and alienation from family and friends.

6.     Grant such other relief this Honorable Court deems just, appropriate, and necessary.

## Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my

knowledge, information and belief that this complaint: (1) is not being presented for any

improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of

litigation; (2) is supported by existing law or by a nonfrivolous argument for extending,

modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if

specifically so identified, will likely have evidentiary support after a reasonable opportunity for

further investigation or discovery, and (4) the complaint otherwise complies with the

requirements of Rule 11.

## For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related

papers may be served. I understand that my failure to keep a current address on file with the

Clerk's Office may result in the dismissal of my case.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

DATED: December 17, 2020

Respectfully submitted,

By: _Salman Khan_

Salman Khan
Plaintiff in Pro Se
3193 Ann St.
 Baldwin, NY  11510; (718) 675-9489;
Sallukhan458@gmail.com

**For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

DATED: ~~November~~ *December* 17, 2020

Respectfully submitted,
By: _____ /s/ Salman Khan _____
Salman Khan
Plaintiff in Pro Se
3193 Ann St.
Baldwin, NY 11510
(718) 675-9489
Sallukhan458@gmail.com

# CERTIFICATE OF SERVICE

I certify that on ~~November 1~~ December 1, 2020, the foregoing COMPLAINT AND REQUEST FOR INJUNCTION was served via U.S.P.S. First Class Mail postage prepaid to the persons named below:

National Geographic Partners, LLC, ("NatGeo")
ASOP: Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

The Walt Disney Company ("Disney")
ASOP: Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

Hulu, LLC ("Hulu")
ASOP: Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

YOUTUBE Entertainment Studios, Inc. ("YOUTUBE")
ASOP: The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Netflix, Inc. ("Netflix")
ASOP: The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Comcast Capital Corporation ("Comcast")
ASOP: Comcast Capital Corporation
1201 N. Market Street, Suite 1000
Wilmington, DE 19801

NBCUniversal Media, LLC
ASOP: Enterprise Corporate Services, LLC
1201 N. Market Street, Suite 1000
Wilmington, DE 19801

DATED: This 1 day of ~~November,~~ December 2020

_____ /s/ Salman Khan
Salman Khan, Plaintiff/ In Pro Se



J0001000014
OD: 12 1/2 x 9 1/2

EP14F May 2020

**KED ● INSURED**

USPS TRACKING® NUMBER

9505 5160 2072 0354 4751 72

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

Label 228, March 2016

UNITED STATES
POSTAL SERVICE®

US POSTAGE PAID
**$7.75**
Origin: 11510
12/19/20
350435051Q-15

Retail

**PRIORITY MAIL 1-DAY®**

XPECTED DELIVERY DAY: 12/21/20

HIP
O:
100 FEDERAL PLZ
Central Islip NY 11722-4438

C003

0 Lb 7.00 Oz

1020

(restrictions apply).*
onal destinations.

required.

sions see the

mitations of coverage.

**PRIORITY® MAIL®**

FROM:

**PRIORITY ★ MAIL ★**

UNITED STATES
POSTAL SERVICE®

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM: Salman Khan
3143 Ann St.
Baldwin NY 11510.

RECEIVED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
DEC 23 2020
LONG ISLAND OFFICE

**TO:** Alfonse M. D'mato.
C/o civil filings clerk.
U.S. courthouse, LongIsland Courthouse.
100 Federal Plaza
central ISLIP, N.Y. 11722

FOR DOMESTIC AND INTERNATIONAL USE

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments.
Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; May 2020; All rights reserved.